Mike HERNANDEZ,
Petitioner–Appellant,

v.

Eddie S. YLST, Warden, et al.,
Respondent–Appellee.

No. 88–6459.

United States Court of Appeals,
Ninth Circuit.

Submitted Dec. 3, 1990.*

Decided April 10, 1991.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Eric S. Multhaup, San Francisco, Cal., for petitioner-appellant.

Donald F. Roeschke, Deputy Atty. Gen., Los Angeles, Cal., for respondent-appellee.

Before WALLACE, Chief Judge, O'SCANNLAIN and RYMER, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must determine whether a habeas petitioner's federal constitutional rights were violated by a state court's failure to hold a pre-trial competency hearing.

## I

Petitioner Mike Hernandez was arrested following the shooting death on January 16, 1982, of a man who, at least in Hernandez's mind, was having an affair with Hernandez's wife. The evidence tying Hernandez to the killing was substantial. Witnesses observed Hernandez's vehicle at the scene of the shooting, which was identified by the license plate number. The murder weapon was discovered on the very day of the slaying, buried on Hernandez's in-laws' property. Hernandez's alibi was implausible.

At the request of Hernandez's counsel, a hearing was scheduled for April 27, 1982, to determine Hernandez's competency to stand trial. On the appointed day, however, Hernandez's trial counsel declared that he did not believe a finding of incompetency was warranted. Thus, no incompetency hearing was held. Instead, Hernandez moved for a transfer from the San Luis Obispo County Jail, in which he had been incarcerated since his arrest, to the Santa Barbara County Jail. In support of the motion, Hernandez personally described for the court the reasons behind his request. Hernandez's statement was comprised of (in the words of the California Court of Appeal) "bizarre statements of mistreatment in the jail," including allegations of forced drug injections by jailers and sexual assaults by fellow prisoners.[1]

On April 28, the following day, Hernandez appeared before the court for his pre-trial hearing. At that time, the trial court denied the motion for jail transfer. The case proceeded to trial, commencing on May 4, 1982.

In the midst of his jury trial, Hernandez withdrew his plea of "not guilty" and entered a plea of "not guilty by reason of insanity." The trial court postponed proceedings in the trial so three mental health experts could examine Hernandez and report their opinions concerning his sanity at the time of the offense.

By agreement of the parties, the sanity issue was submitted directly to the trial court on May 17, 1982. The jury was excused. The court considered the written reports of the three appointed experts, plus the written report of Dr. Lawrence Ratner, who examined Hernandez before the trial for defense counsel, plus the transcript of the April 27 hearing. The court found Hernandez sane and convicted him on one count of second degree murder. The petitioner was sentenced to fifteen years to life

---

1. Hernandez's amaranthine 42 U.S.C. § 1983 lawsuit, which he subsequently filed against the correctional officers purportedly involved in these assaults, has inspired spirited judicial debate over the definition of "frivolousness." *See Hernandez v. Denton,* 861 F.2d 1421 (9th Cir. 1988) (2–1 decision affirming in part and revers- ing in part district court's dismissal as frivolous under 28 U.S.C. § 1915(d)), *vacated and remanded,* — U.S. ——, 110 S.Ct. 37, 107 L.Ed.2d 7 (1989), *on remand,* 919 F.2d 573 (9th Cir.1990) (2–1 decision again affirming in part and reversing in part the dismissal).

(with a two-year enhancement for use of a weapon) on June 14, 1982. The state appellate court affirmed the conviction on November 17, 1983.

In late 1985, Hernandez filed a petition for writ of habeas corpus with the California Supreme Court. The petition was denied summarily. Hernandez followed with a habeas petition in federal district court, which was dismissed for failure to exhaust state remedies. A subsequent (and second) state habeas petition filed with California's highest court was also denied summarily.

The present section 2254 habeas petition was filed January 12, 1988. The petition asserted that the trial court had violated Hernandez's right to due process by failing to institute proceedings to determine Hernandez's competence to stand trial, and by permitting statements taken in violation of *Miranda* to be used against him. A magistrate issued an order to show cause, and later filed a report and recommendation without the benefit of an evidentiary hearing. The magistrate concluded that Hernandez was not entitled to the writ because (1) his *Miranda* claim was precluded by his plea of "not guilty by reason of insanity," and (2) his competency claim was not borne out by the evidence.

The district court adopted the magistrate's report and dismissed the petition on August 29, 1988. Hernandez appeals, focusing exclusively on the competency claim. We have jurisdiction pursuant to 28 U.S.C. § 2253. We affirm.

## II

Hernandez first argues that he presented sufficient evidence of his mental incompetence to entitle him to a pre-trial competency hearing.[2] This evidence consisted chiefly of Hernandez's delusional statements made to the court to support a motion for jail transfer. The district court

ruled that no hearing was necessary at that stage because the state trial court reasonably found that the evidence failed to raise a genuine doubt as to Hernandez's competence.

The conviction of an accused person while legally incompetent to stand trial is a clear violation of the constitutional guarantee of due process. *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966). If a state trial court does not employ procedures designed to protect against the trial of an incompetent, the resultant conviction must be reversed. *See id.* at 386–87, 86 S.Ct. at 842–43; *see also Drope v. Missouri*, 420 U.S. 162, 171–72, 95 S.Ct. 896, 903–04, 43 L.Ed.2d 103 (1975). The trial court's constitutional obligation is discharged by holding a hearing to determine competency. *See Pate*, 383 U.S. at 387, 86 S.Ct. at 843.

■ A *Pate* hearing is not required, however, absent a "substantial" or "bona fide" doubt of competency. *See de Kaplany v. Enomoto*, 540 F.2d 975, 979–83 (9th Cir.1976) (en banc), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977).[3] In determining whether or not there is substantial doubt, "the trial judge must evaluate all the evidence." *Chavez*, 656 F.2d at 518. On appeal, we inquire "whether a reasonable judge ... should have experienced doubt with respect to competency to stand trial." *de Kaplany*, 540 F.2d at 983; *see also Pedrero v. Wainwright*, 590 F.2d 1383, 1388 (5th Cir.) (Wisdom, J.) ("The test is an objective one."), *cert. denied*, 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979); *cf. Smith v. Ylst*, 826 F.2d 872, 875 (9th Cir.1987) (stating *de Kaplany* test for question of counsel's competency), *cert. denied*, 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 59 (1988).

---

**2.** The test for competency, at least for federal habeas purposes, is "whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960)

(per curiam); *see also Chavez v. United States,* 656 F.2d 512, 515 (9th Cir.1981).

**3.** Terms such as "sufficient doubt," "bona fide doubt," "good faith doubt," or "genuine doubt" all describe the same constitutional standard. *Chavez,* 656 F.2d at 516 n. 1.

The transcript of Hernandez's statements to the trial court concerning the alleged assaults upon his person is set forth in the margin.[4] This story was evidently delivered with an equanimity which the trial court found inconsistent with incompetency. Hernandez now invites this court to declare such a tale sufficient to raise doubt as to competency as a matter of law.

The invitation is declined. Apart from this tale, Hernandez did not give any indication of mental illness or hallucinations. In *United States v. Auen*, 846 F.2d 872 (2d Cir.1988), on which Hernandez relies, defendant "consistently exhibit[ed] behavior and beliefs" of an extraordinarily bizarre nature. *Id.* at 878. While Hernandez's beliefs were undeniably weird, there was nothing like *Auen*'s extended time-period

4. *The Defendant:* Today I should like to have the opportunity to express some of my concerns about my treatment there at the facility since I've been incarcerated there.

Beginning in January, 19th and 20th, I asked for aspirins and I was given heroin-loaded Tylenol pills inside. I know they were heroin because I felt drowsy. They knocked me out on the 19th and 20th.

Again, on the 21st and 22nd of January I was offered medication in a paper cup by the same officer and I refused to take it.

And again, January 23rd, a Saturday, after having eaten my dinner plate I began to feel drowsy, and my eyes began to close and my speech became impaired. But I could hear and finally I found myself stumbling in my cell. And I started calling for help. So finally the officer came, pulled me out of there and arranged to have me accepted at the emergency center at the Johnson Hospital here in town. And during that time that I was there between 7:30 and 9:30 at night-time I was given a urine and blood specimen analysis, and both the officers that took me there were witness to that. And I was interviewed by the doctor there, a young man, and I told him I feared for my safety at the jail, and I wanted to be transferred. And he said he didn't have anything to do with that. That only my attorney and the court did.

So finally I was taken back to the jailhouse about 9:30 and I was permitted to make a phone call to my wife, which I did. And I told her what had happened. Finally I was taken back to my cell. Out of fear I pulled my mattress from my bunk and threw it underneath, and I slept underneath my bunk for over the night.

But then on Sunday, January 24th, after I spoke to my attorney I went back to my cell and I noticed that on my right hand I had three needle puncture wounds on my right hand on the top. And I know right away that somebody had picked me there with a needle on January 23rd, the previous night.

And on Tuesday—on Monday, January 25th, after I ate breakfast I took a nap and I woke up about 10:00 o'clock, and I had blood coming out of my lips. So I went to the mirror, looked in the mirror, and noticed there was a big puncture there on the corner of my bottom lip on the right side. I took a tissue paper and wiped it off, and made sure there was plenty of blood to show my attorney on the 27th at the courthouse,

Municipal Court. And—but he met with me on Tuesday, the 26th of January, and I told him what had happened. And I gave him the tissue with the blood sample on the 27th at the courthouse the following Wednesday.

I thought things had stopped like that by the end of January, but it didn't because on February 3rd I found another puncture wound on the inside of my right ankle, and another one on my lip, on my upper lip which I showed to the private investigator working under Mr. Maguire within a week after that, I believe. I'm not sure of the date, though.

And I didn't realize, you know, that what was going on until up around the 4th or 5th of March. Again, I found my brown birthmarks scaling, falling off in black scales and black gashes all over my birthmarks on my chest and legs, and my back and my arm by my left side. And I realized finally that I was being injected with heroin throughout my birthmarks and my moles because they don't scab. They don't produce a scab. They just darken off or fall off in scales or get black gashes. That's why it took me so long to figure out what they had been doing to me throughout February and March.

Also, on the same week of March I found evidence on my clothing and on myself of a sexual abuse, but I was so embarrassed to tell my attorney I didn't let him know until April 10th when I found more evidence on my clothing of rape, you know.

Finally, by the 11th and the 13th I realized that they had been raping me all the time when I was drugged, you know. So I told my attorney on the 14th of April, this month, what had happened, what had been going on, and what I had discovered.

And, again, on the 24th, Saturday, I believe, of April, I was sleeping in my cell after I spoke to my attorney between 10:00 and 11:00 at about 11:30 a.m. I woke up and I found my knuckle here hurting, you know. And I noticed there was a red gash there. And I knew right away that somebody had picked me there with a needle. So I looked around my cell for more evidence and underneath the faucet of my sink I found some blood where they had wiped their hand right there.

I should like to request this court to transfer me to a different facility for I fear for my safety now that I have spoken out about my treatment there.

Thank you very much, your honor, for having given me the opportunity.

of odd behavior, the defendant's unwillingness to retain a lawyer or otherwise provide for his own defense, nor the repeated uncooperative conduct toward the proceedings. *See id.* at 873–76. Unlike the situation in *Auen,* there is no indication here that Hernandez could not rationally consult with his lawyer or understand the proceedings against him.

■ Furthermore, in *Auen,* counsel for the *government* indicated that defendant was paranoid and held "irrational beliefs." *See id.* at 878. Here, Hernandez's own counsel stated that Hernandez was competent. While the opinion of Hernandez's counsel certainly is not determinative, a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings. *See United States v. Clark,* 617 F.2d 180, 186 (9th Cir.1980) (fact that defendant's attorney considered defendant competent to stand trial was significant evidence that defendant was competent). We deem significant the fact that the trial judge, government counsel, and Hernandez's own attorney did not perceive a reasonable cause to believe Hernandez was incompetent. *See United States v. Richardson,* 586 F.2d 661, 667 (9th Cir.1978).

Hernandez points to the psychological evaluation report prepared by Dr. Lawrence Ratner at defense counsel's behest, issued approximately three months prior to trial, as further evidence of incompetency. Dr. Ratner's report was evidently not filed with the court until after the trial had begun, and thus could not have contributed to any pre-trial determination of doubt. *See Moore v. United States,* 464 F.2d 663, 666 (9th Cir.1972) (per curiam) (" '[e]vidence' encompasses all information properly before the court"). Moreover, Dr. Ratner's opinions were derived solely from two interviews with Hernandez; Dr. Ratner was not provided with records reflecting Hernandez's past medical or psychological history. *See United States v. Cruz,* 805 F.2d 1464, 1479 (11th Cir.1986) (psychiatrist's testimony insufficient to establish bona fide doubt where it was speculative and opinion was reached without benefit of previous medical or psychiatric records),

*cert. denied,* 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 *cert. denied,* 482 U.S. 930, 107 S.Ct. 3215, 96 L.Ed.2d 702 (1987). Most significantly, while Dr. Ratner found Hernandez to be delusional and depressed, and that his mental deterioration "would have prevented him from appreciating the criminality of his alleged misconduct," he offered no opinion as to Hernandez's competence to stand trial at that time or (obviously) several months later, when the trial was held.

■ Weighing all of the evidence, we cannot say that it was a constitutional violation not to hold a competency hearing simply because of Hernandez's odd beliefs regarding his treatment in jail. "[A] defendant's bizarre actions or statements, or counsel's statement that the defendant is incapable of cooperating in his own defense, or even psychiatric testimony *need not alone* raise sufficient doubt." *United States v. Ives,* 574 F.2d 1002, 1004 (9th Cir.1978) (emphasis in original) (discussing *de Kaplany* ). The trial judge and defense counsel had the opportunity to converse with Hernandez and observe his demeanor, and they concluded that Hernandez's competence was not in serious doubt. Nothing in the nature of the crime suggested otherwise. *See Speedy v. Wyrick,* 748 F.2d 481, 486 (8th Cir.1984) ("There was nothing about Speedy's offense ... to indicate that it was other than a crime of passion.") (contrasting defendant's murder of his ex-wife with the facts in *Drope,* which involved the defendant's participation in the gang rape of his own wife), *cert. denied,* 471 U.S. 1019, 105 S.Ct. 2028, 85 L.Ed.2d 308 (1985). The state trial court's failure to hold a competency hearing does not amount to constitutional error on these facts.

### III

Hernandez also contends that, under state law, the trial court was required to conduct a competency hearing and make an express finding of competence once it had scheduled the hearing. The asserted failure to comply with state law, Hernandez maintains, constituted a violation of the

fourteenth amendment's due process clause. While alleged violations of state law per se are not cognizable in a federal habeas corpus petition, *see* 28 U.S.C. § 2254(a) (1988), federal courts sitting in habeas can and will review an application of state law for alleged constitutional violations. *See Hicks v. Oklahoma,* 447 U.S. 343, 346, 100 S.Ct. 2227, 2229, 65 L.Ed.2d 175 (1980); *see also McQueary v. Blodgett,* 924 F.2d 829, 831 n. 1 (9th Cir. Jan. 10, 1991) ("The writ of habeas corpus exists precisely to allow *federal-based* challenges to state law.") (emphasis added); *Oxborrow v. Eikenberry,* 877 F.2d 1395, 1400 (9th Cir.) ("errors of state law do not concern us unless they rise to the level of a constitutional violation"), *cert. denied,* —— U.S. ——, 110 S.Ct. 344, 107 L.Ed.2d 332 (1989).

Federal courts are extraordinarily chary of entertaining habeas corpus violations premised upon asserted deviations from state procedural rules. *See, e.g., Bell v. Duckworth,* 861 F.2d 169, 170 (7th Cir. 1988) (publishing disposition in unmeritorious appeal "only to make as clear as we can that procedural errors committed in the course of a state criminal trial are not a ground for federal habeas corpus") (citing *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982)), *cert. denied,* 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989). As the Supreme Court stated when considering a habeas petition premised upon a purportedly faulty jury instruction:

> Before a federal court may overturn a conviction resulting from a state trial in which this instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.

*Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). We have pointed out that the Great Writ is available only where "the Constitution or other federal law specifically protects against the alleged unfairness or guarantees the procedural right in state courts." *Middleton v. Cupp,* 768 F.2d 1083, 1085 (9th Cir.1985) (citation omitted), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986).

Hernandez contends that under California law, a state court loses jurisdiction to try and to sentence a criminal defendant from the time a competency hearing is ordered until that hearing is actually held. He further contends that a writ of habeas corpus lies for state prisoners convicted by courts which lacked jurisdiction under state law. Indeed, some courts have held that an absence of jurisdiction in the convicting court is a basis for federal habeas corpus relief cognizable under the due process clause. *See, e.g., Lowery v. Estelle,* 696 F.2d 333, 337 (5th Cir.1983) (state court jurisdiction); *cf. Schlomann v. Moseley,* 457 F.2d 1223, 1227 (10th Cir.1972) (military court martial), *cert. denied,* 413 U.S. 919, 93 S.Ct. 3068, 37 L.Ed.2d 1041 (1973). We are not persuaded that a constitutional violation necessarily occurs when the convicting state court acts without jurisdiction purely as a matter of state law. *See United States ex rel. Herrington v. Mancusi,* 415 F.2d 205, 208–09 (2d Cir.1969) (regarding same proposition with considerable skepticism); *see also Martin v. Solem,* 801 F.2d 324, 331 (8th Cir.1986) (finding similar question not cognizable where state supreme court had already ruled that trial court had jurisdiction as a matter of state law).[5] We need not make that determination today, however, because Hernandez

---

**5.** In *Anderson v. Gladden,* 293 F.2d 463 (9th Cir.), *cert. denied,* 368 U.S. 949, 82 S.Ct. 390, 7 L.Ed.2d 344 (1961), we affirmed the denial of a habeas corpus petition brought by a Native American who contended that Oregon state courts, in which he had been convicted of homicide, lacked jurisdiction. His challenge to the trial court's jurisdiction was premised on federal and state law. *See id.* at 464. As to Oregon law, we concluded then that the applicable state statute did provide for state court jurisdiction. *See id.* at 467–68. See also *Rogers v. Squier,* 157 F.2d 948 (9th Cir.1946), *cert. denied,* 330 U.S. 840, 67 S.Ct. 977, 91 L.Ed. 1287 (1947), in which we construed state law to determine that the

has failed to persuade us that California law was violated at all. *See id.* (examining state law to determine whether convicting state court had jurisdiction); *Moore v. McCotter,* 781 F.2d 1089 (5th Cir.1986) (same); *Herrington,* 415 F.2d at 209–11 (same).

Hernandez urges that California law mandates an express determination of competency once a hearing is ordered. This contention is based on language from two recent opinions of the California Supreme Court, *People v. Hale,* 44 Cal.3d 531, 244 Cal.Rptr. 114, 749 P.2d 769 (1988), and *People v. Marks,* 45 Cal.3d 1335, 248 Cal.Rptr. 874, 756 P.2d 260 (1988). Those cases held that "[o]nce the trial court ordered the hearing ... it could not simply vacate the order, sub silentio." *Hale,* 44 Cal.3d at 540, 244 Cal.Rptr. at 120, 749 P.2d at 774. The trial court's jurisdiction to proceed is divested "pending express determination" of the issue. *Id.* at 541, 244 Cal.Rptr. at 121, 749 P.2d at 775; *see also Marks,* 45 Cal.3d at 1344, 248 Cal.Rptr. at 880, 756 P.2d at 267 (quoting *Hale* with emphasis on "express"); Cal.Penal Code § 1368(c) (West 1982) ("[W]hen an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined.").[6]

At the threshold, we are not convinced that the trial court in Hernandez's case ever ordered a section 1368 competency hearing. Hernandez was arraigned on an amended information on Friday, April 23, 1982. The court accepted Hernandez's plea

and indicated that the scheduled dates for the pre-trial hearing (April 28) and trial (May 3) would remain unchanged. At that time, no mention was made of a hearing set for April 27, 1982, and certainly there was no indication that anyone questioned Hernandez's competence to stand trial.

The transcript from Hernandez's April 27 appearance also suggests that the trial judge had not ordered a competency hearing. At the onset of the "hearing," the trial judge noted that the proceeding "was specially set at the request of [defendant's counsel]." Hernandez's attorney explained that the hearing "was put on calendar because I told [the prosecutor] of my intention to raise the issue of 1368, incompetency," based upon a weekend conversation between Hernandez and counsel. Thus, the hearing presumably was scheduled with the court on Monday, April 26. Counsel then explained that he no longer felt a hearing was necessary, based upon his conversation with Hernandez that same afternoon. This colloquy indicates to us that the judge never ordered a competency hearing, despite the fact that an appearance was scheduled in order to give counsel an opportunity to explore the competency issue.[7]

Assuming that the trial court did "order" a competency hearing in the sense meant by *Hale* and *Marks,* we are not persuaded that the California Supreme Court intended its broad language to cover a situation such as this. The "mandatory" language of both the statute and the recent cases is premised upon the trial judge's actual doubt of the defendant's competency. *See* Cal.Penal Code § 1368(a) (West 1982) (pred-

---

federal courts had retained jurisdiction to convict habeas petitioner.

6. In Hernandez's direct appeal of his conviction, he did not make this precise claim. Indeed, *Hale* and *Marks* were decided some five years after the California Court of Appeal's ruling on Hernandez's direct appeal. Thus, we cannot simply defer to the state appellate court's determination of this issue. *Cf. Martin,* 801 F.2d at 331 (relying upon state supreme court's decision on direct appeal to resolve jurisdictional question); *Moore,* 781 F.2d at 1093 (looking to state intermediate appellate court's ruling on direct appeal for guidance as to state law).

7. In *Marks,* the state's highest court rejected an argument that the trial judge had not ordered a hearing pursuant to section 1368(c), but simply "intended only to have a 'preliminary' hearing to determine whether there was sufficient evidence to require a competency hearing." 45 Cal.3d at 1340–41, 248 Cal.Rptr. at 878, 756 P.2d at 264. However, that argument was clearly inappropriate in *Marks,* based as it was on "sheer speculation" and contradicting the court's *express* statement of doubt as to competency and its order of "a special hearing which will be held pursuant to Sections 1368.1 and 1369." *Id.* at 1341, 248 Cal.Rptr. at 878, 756 P.2d at 264–65.

icating entire procedure on trial judge's doubt of competency); *see, e.g., Marks,* 45 Cal.3d at 1340, 248 Cal.Rptr. at 877–78, 756 P.2d at 264 (quoting a guide for trial judges which states "a hearing ... must be held if the trial judge has declared a section 1368(a) doubt"); *Hale,* 44 Cal.3d at 541, 244 Cal.Rptr. at 120, 749 P.2d at 775 ("once a doubt has arisen as to the competence of the defendant ... the trial court has no jurisdiction to proceed"). In both *Hale* and *Marks,* the trial court specifically stated for the record that doubt had been raised as to defendant's sanity. *See Marks,* 45 Cal.3d at 1338, 248 Cal.Rptr. at 876, 756 P.2d at 263 (quoting trial court's expression of doubt with emphasis); *Hale,* 44 Cal.3d at 535 & n. 5, 244 Cal.Rptr. at 116 & n. 5, 749 P.2d at 771 & n. 5 (quoting trial judge). In contrast, the record in this case contains no indication that the trial judge ever harbored any doubts as to Hernandez's competence to stand trial.

Hernandez argues that the trial judge's reason for ordering the hearing (including whether he harbored any doubts himself) is irrelevant to this question, because the appellate court is not to second-guess the trial court's finding that a hearing was required. Petitioner's argument, however, appears to assume that which is in doubt—that the trial court truly did find that a hearing was required. We are simply not persuaded that the California Supreme Court would require a hearing every time a trial judge who harbors no doubts whatsoever about the defendant's competence affords counsel the opportunity to investigate her client's psyche. There is no showing in this record of a deprivation of due process amounting to a violation of Hernandez's constitutionally protected rights.

### IV

Because we conclude that the federal constitution did not require a pre-trial competency hearing for Hernandez, we need not decide whether the sanity trial conducted by the trial court pursuant to Hernandez's "not guilty by reason of insanity" plea sufficed as a substitute. The petition for a writ of habeas corpus was properly denied.

AFFIRMED.